SUTCLIFF v. SELIGMAN et al.

(Circuit Court of Appeals, Second Circuit. February 25, 1903.)

No. 52.

1. SHIPPING—CONSTRUCTION OF CHARTER PARTY—DEVIATION FROM AUTHORIZED USE.

A steam launch was demised for two weeks, by a written charter party, to be used "for a coaching launch for the University and Freshmen crews of Columbia College, on the Hudson river." The owner had refused to charter the launch to the same charterer for use on the Harlem river. On the tenth day of the charter the launch was sent through to the Harlem for a boat, and, owing to the breaking of a bridge, was compelled to return by way of East river; and when she reached a point in Hell Gate she was disabled by the breaking of a pin which connected the eccentric with the shaft of the engine, and the master was obliged to engage a tug to take her in. The owners of the tug libeled the launch,

and obtained an award for salvage; the charterer refusing to defend after notice of the claim. It was admitted that the locality where the accident occurred was more dangerous to navigate than the Hudson, and that, owing to the tide and currents there, the launch could not be taken home with sweeps, as was ordinarily done on the Hudson in case of a breakdown. The regular engineer being absent, a special man for the trip was employed, who was unfamiliar with the locality and .the boat, and was unable to find the tools to make temporary repairs, which might have been done. *Held* that, in view of the circumstances under which the charter was made, the limitation therein to the Hudson river was a material part of the agreement, and the departure from the locality specified constituted a deviation from the charter party, and the charterer liable as an insurer for the damages resulting therefrom, which *included, under the facts shown, not only the cost of repairs, but the amount of the decree and costs and proper disbursements in the salvage suit.*

Appeal from the District Court of the United States for the Southern District of New York.

For opinion of District Court, see 110 Fed. 560.

Nelson Zabriskie, for appellant.

Geo. D. Seligman, for appellees.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. This cause comes here upon appeal from a decree of the United States District Court for the Southern District of New York, which dismissed the libel.

The libelant, being the owner of the steam launch Sinbad, let it to the Columbia College Union by a written charter party dated April 28, 1896. Said charter party provided that the launch should be used "for a coaching launch for the University and Freshmen crews of Columbia College, on the Hudson river, for a period of two weeks from April 28, 1896, for the sum of $150"; that "the said launch is in good condition"; and that the union would take out a policy of insurance for the benefit of the charterer, and "agrees to return the said launch, at the end of the term aforesaid, in as good condition as at the time of the execution of this agreement, damage by usual wear and tear excepted." Upon the execution of the charter the launch was delivered to the union, and used daily by it for coaching purposes on the Hudson river until May 8th. On said day the master, under instructions from the union, took the Sinbad to the old boathouse on the Harlem river, in order to bring from there a boat to the new boathouse on the Hudson river. When he reached Spuyten Duyvil Bridge on the return trip, he found the bridge broken down, and he was therefore obliged to turn about and go through the East river and around the Battery. When he reached a point in Hell Gate opposite the Astoria Ferry slip, the engines became disabled; and the master, being unable to bring the launch to shore, had her towed back to the moorings at the Atlantic Basin, from which she had been taken when originally chartered.

The learned District Judge held that:

"The trip to the former boathouse at 125th street and Harlem river, in order to procure the small boat and oars needed for coaching purposes, was

so germane and incidental to the express purpose of the charter as to constitute no violation of its general provision."

We should not question the correctness of this ruling if it were not for certain special conditions connected with this particular undertaking, and circumstances attendant upon this accident. The question of deviation is one which must be determined by ascertaining, in the light of all the surrounding facts, in how far the exact terms of the charter party were considered material by the parties.

Respondent's witness Twiggs, the master of the launch, and who was in command at the time of the accident, admits that Hell Gate is a dangerous place, by reason of slack water and conflicting currents, and that navigation there is more difficult than in the location covered by the charter. Cummins, the engineer employed by respondent for this special trip, had never run this launch alone before, had never navigated her on the East river, and had never navigated any boat in the waters where the breakdown occurred.

The evidence of libelant's husband is as follows:

"Q. In entering into the written charter party in suit on behalf of your wife, were you influenced at all by the fact that the coaching of the Columbia College crews was to be upon the Hudson, rather than upon any other river? A. In the original charter for two months it was specified that the boat was to be used solely on the Hudson river. I refused to charter for the Harlem river at all. Q. Whom did you refuse? A. Mr. Conover. Q. Did he ask you for a charter for the Harlem? A. He told me that he wished to charter the boat. He came to my house in 40th street in answer to the advertisement in the paper; told me that he wished to charter the boat for the Harlem river. I told him I refused to charter on the Harlem river. He went away, and came back a few days later and told me that it wouldn't be necessary to use the boat on the Harlem—that the new boathouse would be completed and ready for occupancy—and would I charter for the Hudson river. I told him 'Yes.'"

This testimony is not denied. Mr. Conover stated that he had no recollection in regard to the matter, one way or the other.

The policy of insurance taken out for the benefit of the libelant contained the following clause:

"Warranted by the assured to be employed as a coaching boat in the vicinity of Columbia College Union Boat Club, 116th street, North river."

In view of these special circumstances, we are constrained to hold that the limitation to the Hudson river was a material part of the agreement; that the departure from the locality specified in the charter party, and the use of the launch in a locality confessedly more dangerous, involving, as will hereafter appear, far more serious consequences than would otherwise have followed, constituted a deviation from said charter party, and rendered the respondent liable as an insurer for damages resulting therefrom. The preponderance of evidence supports the finding of the District Judge that the breakdown of the launch must have soon occurred on the Hudson river. The charter party would, however, have expired in four days more; and none of the damages herein complained of would have necessarily or probably resulted if the regular engineer had been in charge, or if the launch had been in the stipulated locality. It appears that the accident was

due to the breaking of a small pin which connected the eccentric of the engine with the shaft. While this break disabled the engines so that it could go neither backwards nor forwards, it was not otherwise, in itself, a serious matter, as it could have been replaced in a few minutes, either on the launch, with proper tools, or in a machine shop, or a new pin could have been made and inserted at a cost of $4. The evidence tends to show that it had broken twice before, and had been repaired by means of a setscrew. Respondent's master testified that "they carried extra pins—three or four extra pins—and had some way of taking the pin out and replacing it," by way of temporary repair, until the boat could be taken to a repair shop. On this occasion, however, the newly employed engineer was not familiar with the boat, and the suitable tools to make repairs could not be found. The master testified that he ordinarily used sweeps on the Hudson to get home with in case of the breakdowns, which were liable to occur at any time while coaching. But in this location such sweeps were unavailable. The master testified as follows:

"We got our sweeps out then and started to row the boat to a landing, and then we tried for a while, and the tide was running stronger, and I couldn't make the cove, so I hailed the tugboat."

The master was therefore obliged to secure the services of a tow— the Theresa—to take the launch to King's shop, where repairs on her had previously been made. The owners of the Theresa claimed salvage for this service, filed a libel therefor, seized the Sinbad, and obtained an award of $30. Respondent was notified of said claim, but refused to defend.

The libelant herein now claims damages as follows:

| | |
|---|---:|
| Counsel fees | $300 00 |
| Final decree, salvage | 30 00 |
| Final decree, costs | 227 50 |
| Clerk's and marshal's fees on bonding boat | 79 00 |
| Witnesses' fees paid | 25 00 |
| Repairs to boat | 75 00 |
| Loss of anchors and chain | 25 00 |
| Loss of charter for the season from date of filing libel, June 3, 1896, until time repairs were finished, about July 4, 1896, 30 days, at $5 per day | 150 00 |
| | $911 50 |

The only affirmative testimony of the reasonableness of the counsel fees is that of libelant's husband, to the effect that he had two counsel, that he knows he paid them something, and that he believed the $300 claimed in the libel for counsel fees and "expenses necessarily incurred in defending libel" is "a correct statement of the amount of charges for counsel fees made." Even if counsel fees are recoverable in this action, the evidence is insufficient, and the charge is disallowed.

The amount of the final decree, $30, is allowed.

It is difficult to understand upon what theory costs of $227.50 were incurred and taxed and allowed on such a trifling claim, but, as libelant has testified that they were thus taxed and were paid by her, they must be allowed herein.

The item of $79, clerk's and marshal's fees on bonding boat, is disallowed. The evidence shows that the libelants in said case notified the libelant herein that they would not seize the launch if she would leave her in the Atlantic Club Basin, and that in spite of this notice she caused her to be removed to New Jersey in order to escape process. Furthermore, after the seizure of the boat by the marshal, the libelant herein made no attempt to get a surety company bond, and spent 20 days in getting a bondsman.

The item of $25 for witness fees is allowed. It appears that this expense was actually incurred, and was necessary in order to procure expert testimony.

The charge of $75 is for repairs to the boat and engine. Inasmuch as it is admitted that there was no actual damage done to the launch, except the breaking of the pin, nothing should be allowed for alleged repairs to the boat. The evidence already discussed shows that while the broken pin could have been repaired for a small sum, so as to enable the launch to run (the charter would have expired in four days), such repairs would have been temporary only, and that, in order to put the engine in as good condition as when chartered, it was necessary to take out the valve and gear, drill out the pin, and reset the valves, and that $25 is a reasonable charge therefor. Only this charge of $25 is allowed for repairs.

Of the item of $25 for loss of anchor and chain, $20, the value of the anchor, is allowed. There was no chain on the launch when she was chartered. She was provided with a cable, which was returned. An anchor was furnished, and was not returned, but was left by respondent at its boathouse on the morning of the breakdown, and either remained there, or was taken to Poughkeepsie and lost.

The facts in regard to the item of $150 claimed for loss of charter are as follows: On June 13th one Hubbe offered to charter the launch for the season at the rate of $150 a month. The offer was afterwards withdrawn on the ground that the delay to accept it until July 1st had broken the deal. Libelant claims that the attachment of the launch was the cause of the delay. But the seizure of the launch, which was made on June 3d, was solely due to libelant's fault in removing it from the Atlantic Basin. There was also unreasonable delay in procuring a bond, and it further appears that libelant was guilty of unreasonable delay in having the necessary repairs made. Instead of minimizing the losses due to respondents' breach of charter, libelant appears to have attempted to aggravate them. In these circumstances, the loss of charter was not one of the proximate results of the accident, and the claim for damages therefor is disallowed.

The other items of damages claimed on the hearing have been abandoned.

The decree of the District Court is reversed, with costs, and the cause is remanded, with instructions to enter a decree in accordance with this opinion.